# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JEAN CONWAY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 17-40062-DHH** |
| NANCY BERRYHILL, | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

### October 4, 2018

Hennessy, M.J.

The Plaintiff, Jean Conway, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] Docket No. 16. The Commissioner seeks an order affirming the decision. Docket No. 18. Plaintiff has submitted a response opposing Defendant's motion to affirm and in further support of her motion for reversal. Docket. No. 20. In accordance with both 28 U.S.C. § 636(c) and Rule 73(b) of the Federal Rules of Civil Procedure, the parties consented to have me conduct all further proceedings in this matter. Docket No. 11. The above motions are ripe for adjudication.

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this Order should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

For the reasons that follow, this Court GRANTS Plaintiff's motion for an order reversing the decision of the Commissioner (Docket No. 16), DENIES Defendant's motion for an order of affirmance (Docket No. 18), and ORDERS that the case be remanded for further administrative proceedings.

I.  BACKGROUND

A.  Procedural History

Conway filed applications for DIB as well as SSI on March 6, 2012 and March 26, 2012, respectively.  (Tr. 211–222).  In both applications, Conway alleged disability beginning on October 3, 2008.  (Id.).  The applications were denied initially and upon reconsideration.  (Tr. 79–132, 150–155).  Conway requested a hearing on July 8, 2013, (Tr. 156), and a hearing was held before an ALJ on May 22, 2014, at which Conway both appeared and testified (Tr. 53–75).  Conway waived her right to representation at the hearing.  (Tr. 32, 54).  On August 6, 2014, the ALJ issued a decision finding that Conway was not disabled.  (Tr. 29–45).

On June 19, 2015, the Appeals Council denied Conway's request for review, making the ALJ's August 6, 2014 decision final and ripe for judicial review.  (Tr. 19–21; see also 42 U.S.C. § 405(g)).  After a series of requests for an extensions of time, the Appeals Council wrote to Conway on April 17, 2017 to further extend the time within which Conway could file a civil action challenging the Administration's decision.  (Tr. 1).  Having pursued and exhausted her administrative remedies before the Commissioner, Conway filed a complaint in this Court on May 8, 2017, pursuant to 42 U.S.C. § 405(g).  Docket No. 1.  On September 8, 2017, Conway filed a motion for an order reversing the decision of the Commissioner (Docket No. 16), and on October 6, 2017 the Commissioner filed a motion for affirmance (Docket No. 18).  Conway has filed a response to the Commissioner's motion and in further support of her own motion.  Docket No. 20.

B.    Personal History

At the time she claims she became disabled, Conway was 52 years old.  (Tr. 79).  Conway is an Army veteran, has obtained a General Educational Development diploma, and has taken some college courses.  (Tr. 541, 56).  She has been living alone in Massachusetts since June 2012.  (Tr. 37, 41).  She is able to cook for herself, drive, food shop, and walk her dog.  (Tr. 37, 61–62).  For seven years until February 2012, she worked as a personal care aide for an elderly patient.  (Tr. 56, 85).  This job required Conway to work twenty-five to thirty hours per week.  (Tr. 57).  In addition, Conway worked for several months in 2010 as a supervisor for the United States Census Bureau.  (Tr. 58–59).  This job required Conway to work twenty to forty hours per week.  (Tr. 59).

C.    Medical History

 On November 18, 2010, Conway saw clinical psychiatric pharmacist Joy R. Miller at the Veterans Administration in Corpus Christi, Texas ("Corpus Christi VA").  (Tr. 429).  Dr. Miller noted that Conway had been on medication to help Conway with sleeplessness, depression, anxiety, and pain.  (Tr. 428).  Conway reported working part-time at the same job for five years, an apparent reference to her ongoing employment as a personal care aide.  (Tr. 430).  She reported increased anxiety, and lack of motivation and energy.  (Id.).  Conway also reported having no side effects from current medication, but reported smoking marijuana daily.  (Id.).  Dr. Miller diagnosed Conway with residual depression, and prescribed a new medication—citalopram—while advising Conway to maintain the current medication and therapy, and discontinue marijuana use.  (Tr. 431).

On April 8, 2011, Conway received mental health treatment at the Corpus Christi VA from Doris Alvarez, LCSW.  (Tr. 418).  Conway had been seeing Ms. Alvarez for counseling since 2009.  (Tr. 540).  Ms. Alvarez reported Conway's overall mood seemed more stable and that Conway was working and able to provide for her financial needs.  (Tr. 418).  She also reported

that Conway's appetite and sleep had improved. (Id.). Conway told Ms. Alvarez that she had passive suicidal thoughts but would never act on them. (Id.). The session ended prematurely when Conway expressed significant pain. (Id.).

The same day, Conway saw Dr. Miller and reported that the citalopram medication targeting residual depression was helping a lot. (Tr. 421). In addition to decreased depression, Conway reported reduction in anxiety, a healthy appetite, and adequate sleep. (Id.). Conway also reported to Dr. Miller that she was still working part-time at the same job she had for five years and that she recently "picked up a new client." (Id.). In addition, Conway demonstrated increases in motivation and energy, and was regularly taking her dog to the beach and park. (Id.). Dr. Miller observed that Conway was friendly, cooperative, appropriately dressed and groomed, and had "a much brighter affect" than in previous appointments. (Tr. 422). Dr. Miller further noted that Conway's psychiatric condition was significantly improving. (Id.).

On June 6, 2011, pursuant to a referral from Doris Alvarez, Conway met with Dr. Melissa Pinson at the Corpus Christi VA. (Tr. 540). Dr. Pinson observed that Conway was alert, oriented, and defensive, and had a low activity level but appropriate appearance. (Tr. 543). Conway informed Dr. Pinson that she was experiencing depression and anxiety since 2008 due to the end of a thirty-year relationship in 2008. (Id.). Conway reported first seeking mental health treatment in 2003 following a car accident, and informed Dr. Pinson that her mother committed suicide in 1978. (Id.). Conway reported having PTSD symptoms as a result of the car accident, but that these symptoms were relieved with counseling and that she "has not been experiencing any re-experiencing of this event or avoidance related to this incident." (Id.). Conway also stated that she was raped while in the military but that "she is not bothered by [it] at this time." (Tr. 542). She reported that she was employed as a home health aide but that she was living below the poverty

line.  (Id.).  Dr. Pinson offered to refer Conway for financial counseling, but Conway declined.

(Id.).  Conway reported loss of interest and enjoyment of activities, and having ongoing legal issues

surrounding the property she shared with her long-term ex-partner.  (Id.).  She also reported daily

use of marijuana.  (Tr. 543).  Dr. Pinson advised Conway to quit marijuana use because of its

negative mood effects, and Conway told Dr. Pinson that she realized she should quit.  (Id.).

Conway denied current suicidal ideation or intent and her judgment seemed adequate.  (Tr. 544).

Dr. Pinson diagnosed major depressive disorder and moderate anxiety, and assessed a Global

Assessment of Functioning ("GAF") score of 55.[2]  (Id.).

On July 11, 2011, Conway again met with Dr. Pinson.  (Tr. 535).  Dr. Pinson noted that

Conway was dressed and groomed appropriately but appeared depressed and irritable.  (Id.).

Conway reported that her symptoms of anxiety and depression were the same as the previous

month.  (Id.).  She appeared to be "maintaining coping with symptoms."  (Tr. 536).  Conway was

concerned about losing her job if her home health patient passed away and not being able to find

another job in the same field since she now had a "psychiatric record."  (Tr. 535).  Dr. Pinson

helped Conway identify evidence that does not support these anxious beliefs.  (Id.).  Conway

declined Dr. Pinson's offer for employment counseling.  (Id.).  Dr. Pinson reiterated Conway's

diagnoses and GAF score of 55.  (Tr. 536).  These diagnoses and GAF score were approved by

supervising and cosigning psychologist Dr. Armando Berumen.  (Tr. 535–36).

---

[2] A GAF score is based on "a 100-point scale that rates "psychological, social, and occupational functioning" under the Diagnostic Statistical Manual of Mental Disorders.  Am. Psych. Assn., Diagnostic Statistical Manual of Mental Disorders 32 (4th ed., Am. Psych. Pub., Inc. 2002).  While the most recent edition of the manual no longer includes the GAF scale, providers still refer to it for assessment purposes.  Am. Psych. Assn., Diagnostic Statistical Manual of Mental Disorders (5th ed., Am. Psych. Pub., Inc. 2003).  A GAF score between 51 and 60 indicates:  "Moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with co-workers)."  DSM-III-R Axis V:  Global Assessment of Functioning Scale (GAF), available at http://macarthur.virginia.edu/Data/Pdf/gaf.pdf.

In August and September 2011, Conway failed to attend scheduled appointments with Dr. Pinson. (Tr. 530, 533). On October 26, 2011, Conway met for seventy minutes with Dr. Pinson, who observed that Conway appeared depressed, but oriented, appropriately dressed and groomed, and without hostility that Conway exhibited in past meetings. (Tr. 526). Conway reported that her symptoms of depression and anxiety were "the same." (Id.). Dr. Pinson also noted that Conway brought with her "The Dialectical Behavior Therapy Workbook," which a friend had given her. (Id.). Conway stated that she has been sleeping roughly sixteen hours per day to avoid depression, and that she feels socially isolated. (Id.). In addition, Conway reported that she sometimes experiences brief suicidal ideation but that this ideation has not increased in frequency since 2008. (Tr. 526–27). Dr. Pinson reiterated Conway's diagnoses and GAF score of 55. (Tr. 527). These diagnoses and GAF score were approved by supervising and cosigning psychologist Dr. Jennifer A. Wood. (Tr. 526).

On the same day, Conway saw Dr. Miller. (Tr. 524). Conway told Dr .Miller that she has been anxious over the past few months due to job insecurity, "but this has resolved." (Id.). She also reported increased sleep, weight gain, and increased appetite as a result of one of her prescribed medications. (Id.). Conway further reported continued marijuana use but only one-half joint per day. (Id.). Dr. Miller noted that Conway denied having any suicidal ideation, intent, or plan, that Conway is controlled on her current therapy regimen, and that she has shown decreases in depression and anxiety. (Tr. 525). Dr. Miller continued Conway on her current medication treatment plan except for clonazepam, which Dr. Miller discontinued due to marijuana abuse. (Id.). Dr. Miller told Conway that she would restart clonazepam if Conway passed a drug test the following month and continued to pass drug tests thereafter. (Id.).

On February 1, 2012, Conway met with Dr. Miller. (Tr. 517). Conway reported additional weight gain, cigarette cessation, and walking two miles a day with her dog. (Id.). She also noted that she has not been eating healthy foods because she has no motivation to cook even though she purchases healthy foods. (Id.). Conway also reported that within the year she would like to go home to New England, where she has friends and family. (Tr. 517). Dr. Miller did not restart clonazepam treatment due to continued marijuana abuse, but continued Conway's current medication program. (Tr. 517–18).

On February 21, 2012, Dr. Pinson and Conway had a telephone conversation, during which Conway advised Dr. Pinson that the woman Conway had been caring for had just died. (Tr. 516). Conway also noted that the decedent's family asked Conway to continue work caring for decedent's husband. (Id.). Conway expressed concern with this proposal and Dr. Pinson discussed reasons with Conway for continuing to work. (Id.).

On February 23, 2012, Conway called Dr. Pinson and expressed feelings of heightened depression. (Tr. 514). Conway stated that she was still not sure if she wished to continue to work for the family of her deceased patient. (Id.). Conway also reported some suicidal thoughts but stated she would not carry through with them because of her family. (Id.). Dr. Pinson provided supportive listening and addressed possible hospitalization, which Conway declined. (Id.). On February 27, 2012, Dr. Pinson received another call from Conway, who advised Dr. Pinson that she was going to sell her trailer and that she is temporarily living with a friend. (Tr. 512). Dr. Pinson advised Conway of services available to homeless veterans for which Conway expressed interest. (Id.). Dr. Pinson requested that social worker Rosa Balderas discuss community resources with Conway. (Id.).

On March 2, 2012, Conway met with Dr. Pinson. (Tr. 510). Dr. Pinson noted that Conway's affect appeared depressed but that she was appropriately dressed and groomed, and oriented. (Id.). Conway reported that she has been coping much better lately and that she discontinued marijuana use three weeks prior. (Id.). She stated that she was feeling "back together" and planned to move to Massachusetts to be near family. (Id.). Dr. Pinson reiterated Conway's diagnoses and assessed a GAF score of 60. (Tr. 511). These diagnoses and GAF score were approved by supervising and cosigning psychologist Dr. Armando Berumen. (Tr. 510–11).

On the same day, Conway also saw Rosa Balderas, LCSW. (Tr. 508–09). Conway reported that she no longer had an offer to work for the family of her former patient. (Tr. 508). Conway expressed the desire to return to Massachusetts to be near family if she could not find another job in Texas. (Id.). Conway was also concerned about having to find a place to live since she had decided to sell her trailer. (Id.).

On March 6, 2012, Conway reported to Dr. Pinson via telephone experiencing panic while completing job applications and noted that she planned to attend her scheduled therapy session the following week. (Tr. 507). Conway again telephoned Dr. Pinson on March 12, 2012 to express difficulty working on her to-do list. (Tr. 506). Dr. Pinson observed that Conway did not sound distressed and encouraged Conway to attend her next therapy session. (Id.).

At the scheduled session on March 16, 2012, Dr. Pinson observed that Conway appeared depressed but improved from previous sessions, was appropriately dressed and groomed, oriented, and polite. (Tr. 504). Conway reported that she did not believe she could work and wanted to leave Texas soon. (Id.). Conway also reported that she did not want to return to Massachusetts because of difficulties with her sisters. (Id.). She instead noted the desire to travel to Florida because she had a friend there who offered to her a condo with low rent. (Id.). Dr. Pinson reiterated

Conway's diagnoses and GAF score of 60. (Tr. 505). These diagnoses and GAF score were approved by supervising and cosigning psychologist Dr. Armando Berumen. (Id.).

During a March 22, 2012 session, Dr. Pinson noted that Conway appeared depressed, that her affect had improved, and that she was appropriately dressed and groomed. (Tr. 498). Conway informed Dr. Pinson that she had sold her trailer and planned to move either to Florida or Massachusetts, or apply for housing in Texas. (Id.). She expressed feeling manic, and having difficulty making life-changing decisions. (Id.). Conway stated that since 2008 she has had daily thoughts of harming herself. (Id.) Dr. Pinson further explored this statement because it was inconsistent with Conway's prior reports of the frequency of suicidal ideation. (Id.). Conway strongly denied intent or plan, and declined hospitalization. (Id.). Dr. Pinson reiterated Conway's diagnoses and GAF score of 60. (Tr. 499). These diagnoses and GAF score were approved by supervising and cosigning psychologist Dr. Armando Berumen. (Tr. 500). Five days later, Conway called Dr. Pinson to explain that she moved to Florida and would establish treatment services at the local VA. (Tr. 496).

On March 29, 2012, Conway visited the VA in West Palm Beach, Florida ("Florida VA"). (Tr. 633). She reported that she was on her way to Massachusetts when she ran out of money in Florida. (Id.). Conway reported non-service related PTSD and requested placement, clothing, food, mental and medical health services, a referral to vocational rehabilitation, and information about benefits. (Id.). Conway recounted a detailed plan to harm herself while in Texas. (Id.). She appeared to have a bipolar disorder. (Id.).

On April 26, 2012, Conway met with psychiatrist Elsa Zayas, M.D. at the Florida VA. (Tr. 621–26). Conway discussed her mother's death, the car accident in 2004, and her long-term relationship that ended in 2008. (Tr. 622–23). She stated that she experienced chronic depression.

9

(Tr. 622). Dr. Zayas diagnosed Conway with PTSD and depression, and assessed a GAF score of 45.[3] (Tr. 624). Dr. Zayas placed Conway on a fourteen-day prescription plan discontinuing one medication, adding one, and otherwise continuing Conway's former regimen. (Tr. 624).

In early May, Conway presented to Dr. Linda Welkovitch at the Florida VA. (Tr. 613). Dr. Welkovitch observed that Conway was alert, oriented, and cooperative. (Tr. 614). Conway reported that she was feeling more balanced than usual. (Id.). Dr. Welkovitch noted that Conway's mood was depressed and anxious. (Id.). She assessed a GAF score of 45. (Tr. 615).

On May 15, 2012, Janis Hoewing, LCSW, met with Conway at the Florida VA. (Tr. 600). Conway reported having moved into an apartment. (Id.). She stated she was a "lot less depressed" and "not having any real highs or lows." (Id.). Ms. Hoewing reported that Conway seemed mildly depressed and anxious. (Id.). That same day, Conway called her assigned social worker and told her that she was enjoying her new apartment, and had been making friends. (Id.). She reported reconnecting with a childhood acquaintance and socializing. (Id.).

Three days later, Conway informed Ms. Hoewing that she felt depressed and anxious because of sexual advances by two men. (Tr. 595). Ms. Hoewing noted that Conway exhibited a high level of anxiety, and decreased concentration and focus. (Tr. 596). Conway's GAF score of 45 was reaffirmed. (Id.).

On May 22, 2012, Ms. Hoewing observed that Conway still seemed dysphoric and anxious with low energy and fatigue. (Tr. 561). Conway also presented to the mental health crisis clinic on the same day, requesting an evaluation for depression and anxiety. (Tr. 556). She was observed as casually dressed and groomed, but tearful, anxious, and verbose. (Tr. 557).

---

[3] A GAF score between 41 and 50 equates to "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.")." See DSM-III-R Axis V: Global Assessment of Functioning Scale (GAF), available at http://macarthur.virginia.edu/Data/Pdf/gaf.pdf.

Conway traveled to Massachusetts, where she began to receive housing and other social services from the Boston VA. (Tr. 645—75). Clinical psychologist David Chick, Ph.D. of the Central Western Massachusetts VA conducted an initial mental health evaluation. (Tr. 731). Dr. Chick noted that Conway was mildly depressed and anxious to return to self-sufficiency. (Id.). He assessed major depression, PTSD, and a GAF score of 50. (Id.). One week later, Conway reported feeling better and more stable. (Tr. 730). She reported that she was approved for a housing voucher looked forward to establishing residency. (Tr. 730). She stated she reconnected with family and friends. (Id.). Dr. Chick noted that Conway was calm, relaxed, and that her demeanor was appropriate. (Tr. 731).

On July 17, 2012, Dr. Chick noted that Conway was calm, open, and talkative, that her mood was a little subdued with restricted affect, and that she had found housing. (Tr. 728). On August 1, 2012, vocational rehab therapist John Leva and social worker Gary Dauer met with Conway and noted that Conway's affect was flat after she had found out her application for a particular housing unit was denied. (Tr. 726).

On August 10, 2012, Conway met with Dr. Chick, who observed that Conway appeared guarded and less verbal. (Tr. 724). She continued to show stress and frustration with her living situation and finances. (Id.). Her mood varied from baseline to irritable. (Id.). Dr. Chick noted that there was no evidence, however, of irrational thinking. (Id.).

A week later, Conway met with Dr. John Meyers for medication management. (Tr. 716). Dr. Meyers noted that Conway was pleasant and cooperative, logical, and reasonable. (Tr. 717). He reported that "Conway is definitely competent for all VA purposes" and assessed a GAF score of 48. (Id.).

On August 23, 2012 at a session with Dr. Chick, Conway appeared to be better and experiencing less stress. (Tr. 714). Dr. Chick noted that her affect was restricted but that she was less depressed, guarded, and defensive than in recent sessions. (Id.). Conway told Dr. Chick that she had received two checks since they last met, which helped alleviate some stress. (Id.). Two weeks later, Conway informed Dr. Chick that she was denied Social Security benefits and stated that she was concerned that she couldn't work. (Tr. 707).

Several months later, in December of 2012, Conway reported to Dr. Chick that she was maintaining daily interactions with family and friends, and that her periods of depression were lasting about two hours instead of all day. (Id.). That same day, Conway also met with Dr. Meyers, who observed Conway as tearful at times with a rather sad mood. (Tr. 696). He assessed that Conway had PTSD and chronic depression, but noted that she was pleasant and cooperative, logical, and reasonable. (Id.). Dr. Meyers assessed a GAF score of 48. (Tr. 697).

D.     State Agency Opinions

In June 2012, Dr. Fran Friedman, Ph.D., reviewed the record through May 22, 2012 and found that Conway had severe anxiety and affective disorders. (Tr. 84). Dr. Friedman noted that these diagnoses caused moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. (Id.). Dr. Friedman opined that Conway's statements were only partially credible because some statements were disproportionate to the evidence in her medical records. (Tr. 86). She noted that Conway had social interaction limitations, and that her ability to accept instructions and respond appropriately to supervisors, as well as her ability to interact appropriately with the general public, was moderately limited. (Tr. 87). Dr. Friedman also observed that Conway did not have any problems remembering locations

and work-like procedures, or short and simple instructions.  (Tr. 86).  Conway's ability to understand and remember detailed instructions were moderately limited, but her work history, and objective observations by other medical sources, indicated a capacity to understand and retain simple instructions.  (Tr. 87).  Dr. Freidman noted that Conway's ability to concentrate for extended periods of time was moderately limited but that Conway was not significantly limited with respect to maintaining regular attendance, punctuality, or her ability to work in coordination with or in proximity to others without being distracted by them.  (Id.).  Dr. Friedman also noted that Conway was able to make simple work-related decisions, although her ability to respond to certain changes in a work setting was moderately limited.  (Tr. 87–88) ("[Conway] can persist at tasks within physical tolerances and skill[] levels for an eight hour day, with slightly above normal levels of supervision.").  In sum, Dr. Friedman reported that Conway was able to perform simple, routine, and repetitive tasks that did not require detailed decision-making or lengthy periods of increased focus.  (Tr. 88).

In January 2013, State agency consultant Dr. Celeste N. Derecho reviewed the record through December 2012 and gave an opinion consistent with the Dr. Friedman's, discussed above.  (Tr. 106–32).

E.    VA Disability Rating

On August 7, 2013, Conway filed a claim with the VA for service-connected compensation.  (Tr. 775).  On February 7, 2014, the VA sent Conway a letter informing Conway that she was entitled to individual unemployability effective May 2, 2012 based on "an evaluation

of 70 percent."[4]  (Tr. 775).  While the record contains a true copy of the VA rating decision (the "VA Disability Rating") (Tr. 404–10), it does not contain any of the evidence that the VA considered to support its determination.  (Tr. 408).

The VA Disability Rating was included in the record before the ALJ and is listed on an exhibit list appended to the ALJ's August 6, 2014 decision.  (Tr. 50).  The ALJ noted that he carefully considered "the entire record" before making any findings.  (Tr. 34).

Sometime after the ALJ decision, Conway submitted documentation to the Appeals Council for its consideration.  The Appeals Council responded to Conway's submission by letter dated June 19, 2015, noting that it "has received additional evidence which it is making part of the record."  (Tr. 23).  This documentation included an additional copy of the VA Disability Rating.  (Tr. 789–808).

F.     Hearing Testimony

A hearing before an ALJ was held on May 22, 2014, at which Conway, a vocational expert ("VE"), and a medical expert testified.  (Tr. 52–81).  Conway was not represented by counsel, stated that she understood her right to have legal representation, and wished to proceed without representation.  (Tr. 54).  Conway testified that her last job was as a personal care aide working 25 to 30 hours per week.  (Tr. 56).  She testified that she "did everything" for her elderly patient, helping to bathe, feed, and clothe her, and take care of bedding and other housecleaning.  (Tr. 57–

---

[4] The VA defines a disability rating of 70 percent as follows:

> An evaluation of 70 percent is assigned for occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as:  suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships.

(Tr. 408).

58).  Conway stated that she lost that position, which she had held for seven years, when the patient died in February 2012.  (Tr. 56–57).  For several months in 2010, while also working as a personal care aide, Conway worked as a supervisor for the United States Census Bureau for 20 to 40 hours per week.  (Tr. 59).

She stated that she was homeless in 2008, but thereafter bought and began living in a travel trailer.  (Tr. 58).  Conway testified that although she was able to cook and clean for, and bathe and dress her elderly patient, Conway herself was disabled at that time because of her state of mind.  (Tr. 58).  When asked how she was disabled in 2010 while working for the Census Bureau, Conway testified that as a supervisor, she, for the most part, only had to sign paperwork.  (Tr. 60).  She further testified that on occasion she had to verify the accuracy of the paperwork that she was responsible for.  (Tr. 60).

After Conway's patient died, Conway attempted to make her way to Lawrence, Massachusetts from Texas, where she had been living and working.  (Tr. 61).  On the way, she ran out of money in Florida and was provided shelter by the local VA.  (Tr. 61).  After a short while, she obtained a ride to Massachusetts from a friend.  (Tr. 61).

Conway testified that she currently lives in an apartment in Charlton, Massachusetts with her dog.  (Tr. 61); see also Docket No. 1 ¶ 6.  She walks the dog, drives, shops, cooks, and does her own laundry.  (Tr. 62).  She has chronic pain in her right side and left shoulder areas, and had sought treatment for the pain while in Texas, but has not sought treatment in the past several years.  (Tr. 63).  While Conway does not have medical insurance, she receives monetary benefits as a veteran for PTSD and depression.  (Tr. 63).  She testified that she had a history of alcohol and marijuana use, but last had alcohol in June 2004 and had not smoked marijuana for one month

before the hearing.  (Tr. 64).  At the time of the hearing, she was taking two medications:  one for anxiety and sleeplessness, and the other for depression.  (Tr. 65).

Following Conway's testimony, the medical expert John Ruggiano ("Dr. Ruggiano"), a physician with a specialty in psychiatry, testified that he reviewed Conway's entire record of medical treatment, all of which came from various VA hospitals throughout the country.  (Tr. 66) ("All of my information is from the VA system, various VA hospitals in the country.  It spans a period of time from 2005 to March of 2013, and it's more or less consistent throughout the years.  It's the same discussions of pathology in 2005 as it was in 2013 . . . .").  Dr. Ruggiano's overall opinion was that in spite of the various diagnoses in the record, the data consistently showed problems related to cannabis abuse.  (Tr. 66).  Dr. Ruggiano also noted the differences between depression as a mood and depression as an illness, and stated that while the former was present in this case, the latter was not.  (Tr. 68).

Dr. Ruggiano testified that in his opinion Conway did not meet the requirements of a Listing 12.09 mental disorder because even though Conway showed signs of social isolation and other symptoms, she was working through most of 2005 to 2012.  (Tr. 68).  He also stated that Conway's diagnoses did not support depression as an illness, as opposed to depression as a mood state relative to any given situation.  (Tr. 68).  Dr. Ruggiano further stated that Conway did not have a mood disorder.  (Tr. 68).

Conway was then given an opportunity to cross-examine Dr. Ruggiano, at which point Conway asked Dr. Ruggiano if he had any records showing that:  she was raped while in the military; her mother committed suicide; she was involved in a car accident that resulted in another's death; or that she was involved in a thirty-year relationship that ended in 2008.  (Tr. 69–70).  Dr. Ruggiano answered all of these questions in the negative.  (Tr. 70).

Following testimony from Dr. Ruggiano, the ALJ heard testimony from the VE. The VE testified to a series of other jobs in Conway's vocational history between 2003 and 2009, all of which were not considered substantial gainful activity. (Tr. 71). The ALJ then asked the VE to consider a hypothetical individual with the same age, educational background, and past work experience as Conway. (Tr. 72). The ALJ then asked the VE to assume that the individual's work would be in the lower one-third of the stress continuum and limited to simple, routine, repetitive tasks, which require concentration for up to two hours at a time. (Tr. 72). The ALJ defined work in the lower one-third of the stress continuum as requiring no independent decision-making and no more than occasional changes in work routine. (Tr. 72). On these assumptions, the VE testified that such hypothetical individual would be able to perform work as a night janitor, packer, or laundry worker. (Tr. 72–73). The ALJ next asked the VE to consider the same facts as those posed in the initial hypothetical with the additional limitation that the individual would be off task 20 to 25 percent of the workday, above break time. (Tr. 73). The VE testified that such an individual would not be employable. (Id.).

On examination by Conway, the VE testified that Conway could perform any of the aforementioned jobs during the day if she could not drive at night. (Id.). Conway then responded:

> No. I can't get along with people. I've never had a job for more than two years. I must have had over 100 jobs, maybe more like 200 or 300 jobs, since I was a girl. I just can't get along with people. My mother had a lot of mental problems and I more than likely inherited them from her, and I just can't get along with people. But, you know, it's not for lack of trying. All the jobs that I've had, you know, it shows that at least I got out there and tried.

(Tr. 74). The ALJ then asked Conway if she had anything else she wanted to add, and Conway stated that she did not. (Tr. 74).

G.      Administrative Decision

In assessing Conway's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits.[5]  See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether she is "doing substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is doing substantial gainful activity, the ALJ will find that she is not disabled.  Id.  Here, the ALJ found that Conway had not engaged in substantial gainful activity since October 3, 2008, the alleged onset date.  (Tr. 34).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ determined that Conway had the following severe impairments: anxiety, depression, and a history of cannabis abuse.  (Tr. 34–35).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled.  Id.  The ALJ found that Conway did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment.  (Tr. 35).

---

[5] For disability benefits, a claimant must demonstrate that her disability commenced prior to the expiration of her insured status for disability insurance benefits.  See 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.130; Laboy v. Colvin, 2017 WL 3668413, at *2 n.1 (D. Mass. Aug. 24, 2017).  Here, Conway had to prove she was disabled on or before September 30, 2012, the last date of her insured status for benefits.  (Tr. 32, 223–24).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520(e). An individual's RFC is her ability to do physical and mental work activities on a sustained basis, despite limitations from her impairments. 20 C.F.R. § 404.1545(a)(1). The ALJ determined that:

> [Conway] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine, repetitive tasks which require concentration for a 2 hour time period; limited to work in the lower one third of [the] stress continuum defined as no independent decision making required and no more than occasional changes in the work routine.

(Tr. 36). The ALJ determined that Conway was capable of working as a night janitor, packager, or laundry worker. (Tr. 44–45). Accordingly, the ALJ found that Conway was not disabled at any time from October 3, 2008, through the date of decision. (Tr. 45).

II.  STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991). The quantum of

proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence. Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003). Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that she is disabled within the meaning of the Social Security Act. Bowen v. Yuckert, 482 U.S. 137, 146 (1987). The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process. Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982). This includes the burden of establishing her residual functional capacity ("RFC"). 20 C.F.R. § 404.1512(c).

III.    ANALYSIS

Conway seeks reversal of the Commissioner's disability determination and a remand, claiming that the ALJ failed to fulfill his obligation to perform a full and fair inquiry. Specifically, Conway alleges that the ALJ breached his heightened duty to Conway to develop the record by (i) failing to elicit critical testimony from the medical expert, Dr. Ruggiano, consistent with the ALJ's affording Dr. Ruggiano's testimony great weight; and (ii) failing to meaningfully consider Conway's VA Disability Rating. For the reasons discussed below, I grant Conway's motion for remand.

A.    Relevant Law

An ALJ has a "duty to develop an adequate record from which a reasonable conclusion can be drawn." Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991). This obligation does not impose a duty on an ALJ to act as the claimant's counsel. It does, however, implicate a duty to identify and address "evidentiary gaps" in the record which, if left ignored, would result in prejudice to the claimant. Torre-Pagan v. Berryhill, 899 F.3d 54, 59 (1st Cir. 2018); see also Dalis

v. Barnhart, No. 02-10627-DPW, 2003 WL 21488526, at *6 (D. Mass. June 24, 2003) (stating the responsibility to develop the record includes, for example, "ordering easily obtained further or more complete records"). This obligation is heightened when a claimant is unrepresented:

> There are limited scenarios in which the ALJ has greater responsibility to develop the record: (1) the plaintiff is unrepresented by counsel; (2) the claim is substantial on its face; (3) there are gaps in the evidence necessary to make a reasoned evaluation of the claim; and (4) the ALJ can fill in these gaps without undue effort.

Jones v. Berryhill, No. CV 16-11011-DJC, 2017 WL 3726018, at *9 (D. Mass. Aug. 29, 2017); see also Heggarty, 947 F.2d at 997 (concluding the responsibility to address evidentiary gaps is heightened when the claimant is proceeding pro se); Nieves v. Sec'y of Health & Human Servs., No. 94-1887, 1995 WL 23132, at *1 (1st Cir. Jan. 23, 1995) ("Among the factors which [the First Circuit] has found increase the Secretary's responsibility to develop the record are appellant's being unrepresented at the hearing and the presentation of a claim which 'itself seems on its face to be substantial.'" (quoting Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980))). Indeed, the Commissioner concedes the following:

> [W]hen a claimant is unrepresented, the ALJ has a heightened duty to develop the record. The ALJ must develop the record with specific information and without evidentiary omissions. Upon reviewing that record, the court must determine "whether the [alleged] incomplete record reveals evidentiary gaps which result in prejudice to the plaintiff." If the ALJ fails to fill those evidentiary gaps, and if they prejudice plaintiff's claim, remand is appropriate.

Mickevich v. Barnhart, 453 F. Supp. 2d 279, 287 (D. Mass. 2006) (second alteration in original) (internal citations omitted) (quoting Mandziej v. Chater, 944 F. Supp. 121, 130 (D.N.H. 1996)).

Although an "ALJ has a duty to develop the record, reversal of the ALJ's decision for failure to request additional information is warranted only where the ALJ's failure is unfair or prejudicial to the claimant's case." Riley v. Berryhill, No. 16-109637-DJC, 2017 WL 3749415, at *10 (D. Mass. Aug. 30, 2017) (quoting Gaeta v. Barnhart, No. 06-10500-DPW, 2009 WL 2487862,

at *6 n.4 (D. Mass. Aug. 13, 2009)); see also Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139 (1st Cir. 1987) (stating a court should remand for additional consideration where "further evidence is necessary to develop the facts of the case fully, that such evidence is not cumulative, and that consideration of it is essential to a fair hearing").  "Prejudice exists when 'additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.'"  King v. Colvin, 128 F. Supp. 3d 421, 438 (D. Mass. 2015) (quoting Gaeta, 2009 WL 2487862, at *6 n.4).  Thus, if an ALJ "fails to fill [] evidentiary gaps, and if they prejudice plaintiff's claim, remand is appropriate."  King, 128 F. Supp. at 437 (quoting Mickevich, 453 F. Supp. 2d at 287).

Applying this law, Conway contends that the ALJ had a heightened obligation to ensure a developed record because Conway was unrepresented.  Further, Conway claims that the ALJ erred in this regard by (i) failing to effectively challenge Dr. Ruggiano's admission of being ignorant about key events likely to impact Conway's mental health while at the same time giving his opinion "great weight"; and (ii) failing to meaningfully consider the VA's 70% Disability Rating.  These two evidentiary shortfalls are discussed in turn below.

B.     Medical Expert Testimony

Dr. Ruggiano testified at the hearing before the ALJ that he reviewed Conway's entire record, which was gathered from various VA hospitals throughout the country.  Dr. Ruggiano's overall opinion was that, in spite of the various diagnoses in the record, Conway's mental health issues were attributable to cannabis use.  Dr. Ruggiano also noted that Conway's record did not support a diagnosis of depression or a mood disorder.  Conway cross-examined Dr. Ruggiano and established that he had no knowledge or recollection (assuming he, in fact, reviewed the entire record) of her (i) rape in the military; (ii) mother's suicide; (iii) involvement in a fatal vehicle

accident; or (iv) thirty-year relationship which ended in 2008. (Tr. 69–70). In the Court's view, an assessment of Conway's disability claim without knowledge and consideration of events of this nature is incomplete. Rather than addressing this deficit in Dr. Ruggiano's testimony, the ALJ gave "great weight" to his opinions. (Tr. 43). On the basis of this record, Conway claims that the ALJ failed in his duty to conduct a full and fair inquiry. The Court agrees.

The ALJ apparently considered expert medical testimony important. The ALJ invited Dr. Ruggiano to appear and opine on Conway's medical history and disability. (Tr. 194). Yet when Dr. Ruggiano confessed ignorance of events likely to impact Conway's mental health—rape while in the military, her mother's suicide, an automobile accident, and termination in 2008 of a thirty-year relationship—the ALJ conducted no meaningful follow-up. There was no suggestion to continue the hearing so Dr. Ruggiano could review these events and offer an assessment of their impact on Conway. There was no attempt to determine whether, now being alerted to them, Dr. Ruggiano wished to reconsider his opinion. Rather, there is the somewhat inexplicable finding by the ALJ, despite this record, that Dr. Ruggiano's opinion was entitled to "great weight." Yet, Dr. Ruggiano's testimony could have been developed without undue effort. See Jones, 2017 WL 3726018, at *9.

The Commissioner contends that the ALJ's obligation was met by allowing Conway to present her case and cross-examine Dr. Ruggiano. In this posture, however, I find that the record is not properly developed. Dr. Ruggiano's testimony and his ignorance of key relevant events called upon the ALJ to exercise a heightened duty of inquiry. Far from discharging this duty, the ALJ gave significant weight to undeveloped testimony from a medical expert who was not acquainted with the record. In sum, the decision to assign heightened importance to Dr. Ruggiano's testimony suffers from the ALJ's failure to develop the bases of Dr. Ruggiano's expert

medical opinion. Because the evidence inquiry "might have led to a different decision," <u>King v. Colvin</u>, 128 F. Supp. 3d 421, 438 (D. Mass. 2015), I grant Conway's motion to reverse and remand.

C.    VA Disability Rating

Conway's failure-to-develop claim also asserts that the ALJ failed to meaningfully consider the VA Disability Rating. While a much closer call than the ALJ's failure to develop the record respecting Dr. Ruggiano's testimony (which is reason alone for remand), I grant Conway's motion on this separate ground also.

In August 2013, Conway filed a claim with the VA for service-connected compensation. (Tr. 775). On February 6, 2014, the VA found Conway 70% disabled as of May 2, 2012, and memorialized this finding in Conway's VA Disability Rating decision. This decision could not have been evaluated by the Disability Determination Services state agency consultants, Drs. Friedman and Derecho, because their reports predate the VA's determination. (Tr. 79–132). However, the decision was included in Conway's medical record before the ALJ and, pursuant to the exhibit list attached to the ALJ's decision, is included as a document upon which the ALJ relied in making his disability determination. (Tr. 50).

As an initial matter, Conway asserts that the ALJ's failure to discuss her VA Disability Rating constitutes reversible error, and cites to case law from other jurisdictions to support this proposition. The Commissioner contends that a discussion of another agency's disability determination is not required under law.

Neither the First Circuit nor the District of Massachusetts has held that an ALJ must provide a discussion of, or assign weight to, another agency's disability determination. An ALJ is required only to <u>consider</u> another agency's disability determination, pursuant to SSR 06-3p. <u>See</u> <u>Maloof v. Colvin</u>, No. CV 15-11940-LTS, 2016 WL 4154294, at *2 (D. Mass. Aug. 5, 2016);

Quigley v. Barnhart, 224 F. Supp. 2d 357, 368 (D. Mass. 2002).[6]   Further, although a written explanation of the consideration an outside disability determination has received would be nothing short of beneficial and is even encouraged, there is no requirement that ALJs do so.  SSR 06-3p, 2006 WL 2329939, at *6 (stating that an ALJ "<u>should</u> explain the consideration given to [disability determinations by other agencies]").  As such, the Court declines the invitation to broaden an ALJ's duty with respect to a VA disability determination.[7]

Rather, the controlling legal principle here is well-settled and undisputed:  "[E]vidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered," even though an ALJ is not bound by such a determination.  SSR 06-3p, 2006 WL 2329939, at *6; <u>see also</u> <u>Alvarez v. Sec'y of Health & Human Servs.</u>, No. 95-1028, 1995 WL 454717, at *1 (1st Cir. Aug. 2, 1995) ("Although disability determinations by other agencies may be considered by the Secretary, they are not binding.").  The issue here is whether the ALJ carried out this mandate.

The record contains a copy of Conway's VA Disability Rating decision itself.  (Tr. 407–10).  The VA concluded that Conway was 70% disabled based on a review of the evidence.  (Tr. 407).   The decision lists eight bulleted items—forms and other documents—that the VA considered in assessing Conway's disability claims.  (Tr. 407–08).  None of these documents is appended to the instant record, and thus none could have been reviewed by the ALJ or the Appeals Council.

---

[6] Similarly, the First Circuit has not held that an ALJ is required to give some weight to a VA disability determination. <u>See</u> <u>Maloof</u>, 2016 WL 4154294, at *2 ("Ten federal circuit courts (albeit not the First Circuit), have considered the issue of whether 'a VA disability rating is entitled to evidentiary weight in a Social Security hearing . . . .'").

[7] In the Court's view, an ALJ would be placed in the absurd position of being required to address each piece of evidence reviewed within the ALJ's written disability decision if required to provide a discussion of another agency's disability determination without regard to the circumstances. <u>See</u> <u>Quigley</u>, 224 F. Supp. at 369 ("[T]here is no explicit requirement that the ALJ make findings regarding every piece of evidence that is entitled to weight.  Thus, the Court would not remand a case because an ALJ failed to mention such evidence.").

On the basis of this record, Conway argues that the record indicates that the ALJ completely failed to consider—take into account when making a judgment (see Consider, OXFORD DICTIONARY (2018))—the VA Disability Rating. Conway's characterization of the record is not quite accurate. The list of exhibits the ALJ reviewed includes the VA Disability Rating decision. (Tr. 50). That decision states the basis for the disability rating. (Tr. 408–09). Finally, the ALJ expressly noted in his disability determination that he had considered all the evidence. (Tr. 32, 34).

The Commissioner responds that the ALJ is presumed to have considered all the evidence before him, and that the failure to mention an item of evidence does not warrant remand, relying on Quigley, 224 F. Supp. at 368–69. (Dkt. no. 19, at p. 14). Further, the Commissioner notes that the ALJ expressly acknowledged that Conway received disability benefits from the VA. Id. Finally, the Commissioner argues that the ALJ necessarily considered the VA Disability Rating because the ALJ "took into consideration VA records of clinical findings and reports—in other words, the underlying evidence on which the VA disability ratings decision was based." Id. at 15 (quoting West v. Colvin, 16-cv-00157-JAW, 2016 WL 7048694, at *4 (D. Me. Dec. 5, 2016), rep. & rec. adopted, 2016 WL 7480267 (D. Me. Dec. 29, 2016)). Hence, the Commissioner argues, all the medical evidence supporting the VA Disability Rating was before the ALJ. Id.

The Commissioner's argument is not without persuasive force. However, in the circumstances of this case, where Conway was unrepresented and there was, as a result, a heightened duty of inquiry, where Conway was found (by the ALJ) to have cognitive limitations, and where it is not clear that the evidence on which the VA Rating Decision is based is cumulative of the information before the ALJ, I believe remand is appropriate.

There is no question that the VA determined that Conway was 70% disabled. (Tr. 26, 776). Yet there is significant tension between the VA's Disability Rating and much of Conway's mental health history.[8] Conway held a responsible job, was a Census Bureau supervisor, responded to medication, appeared at therapy sessions appropriately groomed and dressed, and could care for herself, her health care charge, and a pet dog. For herself and those for whom she was responsible, she cleaned, groomed, shopped, and cooked. In light of this record, the notion that the VA, the principle source of Conway's mental health care (and mental health records), should find Conway 70% should have triggered a duty to develop the record. That is, the ALJ should have obtained from the VA the records which show the basis for the VA's determination. (Tr. 407). Such records would have to have disclosed matters that are simply not captured in the somewhat conflicting mental health history that the record in this case paints of Conway and her ability to work. Moreover, obtaining further documentation from the VA would not have been a burdensome endeavor since most, if not all, of Conway's medical records were provided by the VA to the Social Security Administration in the first instance.

To speculate what such records might show will not advance the Court's assessment of the ALJ's duty. It may turn out that the basis of the VA Disability Rating does nothing to alter the ALJ's determination that Conway was not disabled on or before September 30, 2012. See Teague v. Colvin, 151 F. Supp. 3d 223, 227–28 (D. Mass. 2015) (discussing differences between a VA disability rating based on an estimated average reduction in earnings capacity, and a finding of disability by the Social Security Administration based on a claimant's ability to perform substantial gainful activity). However, such information, which could easily have been obtained from the

---

[8] For example, when Dr. Meyers examined Conway in August 2012, he noted that she was pleasant, cooperative, logical, and reasonable. (Tr. 716–17). He reported that Conway "is definitely competent for all VA purposes" and assessed a GAF score of 48. (Id.).

VA, should have been part of the record and, in the absence of counsel, the law imposed a duty on the ALJ to address this potentially prejudicial evidentiary gap. See King, 128 F. Supp. at 437 ("The ALJ may carry out [his] duty [to develop the record] by seeking additional evidence or clarification from the source, telephoning the medical provider, or requesting copies of the records, a new report, or a more detailed report."); see also Heggarty, 947 F.2d at 997 (concluding a heightened duty when the claimant is proceeding pro se).

IV.    CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Conway's motion for an order reversing the decision of the Commissioner (Docket No. 16) and ORDERS the matter remanded for further administrative proceedings before the ALJ. Accordingly, the Commissioner's motion for an order of affirmance is DENIED (Docket No. 18).


/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE